In re ZYPREXA PRODUCTS LIABILITY LITIGATION.

UFCW Local 1776, Plaintiff,

v.

Eli Lilly & Company, Defendant.

Participating Employers Health and Welfare Fund, Plaintiff,

v.

Eli Lilly & Company, Defendant.

Local 28 Sheet Metal Workers, Plaintiff,

v.

Eli Lilly & Company, Defendant.

Mid–West National Life Insurance Co. of Tennessee, Plaintiff,

v.

Eli Lilly & Company, Defendant.

Sergeants Benevolent Association Health and Welfare Fund, Plaintiff,

v.

Eli Lilly & Company, Defendant.

AFSCME District Council 37, Plaintiff,

v.

Eli Lilly & Company, Defendant.

United Federation of Teachers Welfare Fund, Plaintiff,

v.

Eli Lilly & Company, Defendant.

Nos. 04–MD–1596, 05–CV–4115, 11–CV–5676, 05–CV–4115, 11–CV–6157, 06–CV–0021, 11–CV–5677, 05–CV–2948, 11–CV–5675, 06–CV–6322, 11–CV–5678, 11–CV–5679, 11–CV–5680.

United States District Court, E.D. New York.

Dec. 30, 2011.

### ORDER

JACK B. WEINSTEIN, District Judge:

Counsel for the individual third-party payors and counsel for Eli Lilly & Company

informed the court at a December 19, 2011 hearing that they have agreed on a settlement disposing of the individual third-party payor claims. Third-party payors other than the named plaintiffs will not pursue individual claims. Distribution of the settlement amount among the parties and their attorneys has been agreed upon.

A hearing shall be held to consider approval of the settlement on January 12, 2012, at 10:00 a.m. Interested parties and counsel may appear in person, by written submission, to be filed at least three days before the hearing, or by telephone by contacting Courtroom Deputy June Lowe at (718) 613–2525.

Attached to this order as Appendices A and A–1 are the court's November 18, 2011 order dismissing the class action and converting the named plaintiffs' class action into claims prosecuted individually by the representative parties, and the court's December 19, 2011 order converting the class action on behalf of Participating Employers Health and Welfare Fund into an individual claim. The cases to be dismissed are denominated as follows:

1. *UFCW Local 1776 v. Eli Lilly & Co.*, 04–MD–1596, 11–CV–5676;

2. *Participating Employers Health and Welfare Fund v. Eli Lilly & Co.*, 04–MD–1596, 11–CV–6157;

3. *Local 28 Sheet Metal Workers v. Eli Lilly & Co.*, 04–MD–1596, 11–CV–5677;

4. *Mid–West National Life Insurance Co. of Tennessee v. Eli Lilly & Co.*, 04–MD–1596, 11–CV–5675;

5. *Sergeants Benevolent Association Health & Welfare Fund v. Eli Lilly & Co.*, 04–MD–1596, 11–CV–5678;

6. *AFSCME District Council 37 v. Eli Lilly & Co.*, 04–MD–1596, 11–CV–5679; and

7. *United Federation of Teachers Welfare Fund v. Eli Lilly & Co.*, 04–MD–1596, 11–CV–5680.

The transcript from the December 19, 2011 hearing, as redacted, is attached as Appendix B.

The named plaintiffs' report to the court and request for an order of dismissal is attached as Appendix C.

SO ORDERED.

## Appendix A

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

In re: ZYPREXA PRODUCTS LIABILITY LITIGATION.

UFCW LOCAL 1776 AND PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, ERIC TAYAG, and MIDWEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE, on behalf of themselves and others similarly situated, Plaintiffs,

against

ELI LILLY & COMPANY, Defendant.

LOCAL 28 SHEET METAL WORKERS, on behalf of themselves and others similarly situated. Plaintiffs,

against

ELI LILLY & COMPANY, Defendant.

SERGEANTS BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated. Plaintiffs,

against

ELI LILLY & COMPANY, Defendant.

04–MD–1596, 05–CV–2948, 05–CV–4115, 06–CV–0021, 06–CV–6322.

## ORDER

**Jack B. Weinstein, United States District Judge:**

The United States Court of Appeals for the Second Circuit having concluded that this court's certification of a class of third-party payors as to the plaintiffs' RICO claims was inappropriate, *see UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131–36 (2d Cir. 2010), the class action allegations in the complaint of the third-party payor plaintiffs are stricken. The class action is superseded by the individual actions only, which are de-

scribed below. *See* Transcript of November 14, 2011 Hearing.

The Clerk of Court shall issue new docket numbers for each of the following actions. without requiring payment of fees:

1. *UFCW Local 1776 v. Eli Lilly & Co.,* 04–MD–1596, 11–CV——;

2. *Mid–West National Life Insurance Co. of Tennessee v. Eli Lilly & Co.,* 04–MD–1596, 11–CV——;

3. *Local 28 Sheet Metal Workers v. Eli Lilly & Co.,* 04–MD–1596, 11–CV——;

4. *Sergeants Benevolent Association Health & Welfare Fund v. Eli Lilly & Co.,* 04–MD–1596, 11–CV——;

5. *AFSCME District Council 37 v. Eli Lilly & Co.,* 04–MD–1596, 11–CV——; and

6. *United Federation of Teachers Welfare Fund v. Eli Lilly & Co.,* 04–MD–1596, 11–CV——.

These cases shall proceed as individual actions and are deemed to have been commenced when the original class action was filed. All papers in Nos. 04–MD–1506, 05–CV–2948, 05–CV–4115, 06–CV–0021, and 06–CV–6322 are deemed to be in each of these new files.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Date: November 18, 2011 Brooklyn, New York

### Appendix A–1

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

In re: ZYPREXA PRODUCTS LIABILITY LITIGATION.

UFCW LOCAL 1776 AND PARTICIPATING EMPLOYERS HEALTH AND WELFARE FUND, ERIC TAYAG, and MID–WEST NATIONAL LIFE INSURANCE COMPANY OF TENNESSEE, on behalf of themselves and others similarly situated, Plaintiffs,

against

ELI LILLY & COMPANY, Defendant.

LOCAL 28 SHEET METAL WORKERS, on behalf of themselves and others similarly situated, Plaintiffs,

against

ELI LILLY & COMPANY, Defendant.

SERGEANTS BENEVOLENT ASSOCIATION HEALTH AND WELFARE FUND, on behalf of itself and all others similarly situated, Plaintiffs,

against

ELI LILLY & COMPANY, Defendant.

04–MD–1596, 05–CV–2948, 05–CV–4115, 06–CV–0021, 06–CV–6322.

### ORDER

JACK B. Weinstein, United States District Judge:

The Clerk of Court shall issue a new docket number for the following action, without requiring payment of fees:

1. *Participating Employers Health and Welfare Fund v. Eli Lilly & Co.,* 04–MD–1596, 11–CV–6157(JBW)(RLM)

This case shall proceed as an individual action and is deemed to have commenced when the original class action was filed. All papers in Nos. 04–MD–1596, 05–CV–2948, 05–CV–4115, 06–CV–0021, and 06–CV–6322 are deemed to be in this new file.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Date: December 19, 2011 Brooklyn, New York

### Appendix B

UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

TAYAG et al., Plaintiffs,

v.

ELI LILLY and COMPANY, Defendant.

05cv2948, 05cv4115, 06cv21, 06cv6322.

U.S. Courthouse Brooklyn, New York

December 19, 2011

10:00 a.m.

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE
JACK B. WEINSTEIN

UNITED STATES SENIOR
DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs: HAGENS BERMAN SO-
BOL SHAPIRO LLP BY: THOMAS M. SO-
BOL, ESQ. LAURA BARNES, ESQ. ERIC
YOUNG, ESQ. and JAMES R. DUGAN II,
ESQ.

For the Defendant: PEPPER HAMILTON
LLP BY: ANTHONY VALE, ESQ.

Court Reporter: Burton H. Sulzer (718) 613–
2481

Proceedings recorded by mechanical stenog-
raphy, transcript produced by CAT.

(Open court-case called.)

THE CLERK: Will the people on the
telephone please give their appearances.

MS. BARNES: Laura Barnes on behalf of
plaintiff.

MR. YOUNG: Eric Young on behalf of
plaintiff.

MR. VALE: Anthony Vale on behalf of Eli
Lilly and Company.

MR. SOBOL: Thomas Sobol on behalf of
plaintiff.

MR. DUGAN: James Dugan for plaintiffs.

THE COURT: If you speak, give your
name before you speak so the reporter can
get this.

Are they associated with the present plain-
tiffs here?

MR. SOBOL: They are, your Honor.

THE COURT: All right.

MR. SOBOL:

The background is the following, very
briefly: After the Second Circuit's ruling on
the third-party payer matters, there was a
process that we undertook in order to look at
an amended complaint and search out the
extent to which, it at all, there would be
interest on the part of other third-party pay-
ers.

MR. DUGAN: After the Supreme Court
ruled.

MR. SOBOL: After the Second Circuit
ruled, yes, and the Supreme Court declined
to take certiorari, there was the process that
this court undertook in the late summer and
early fall of this year.

I think it's important that I spend a para-
graph to describe to you a little bit in detail
what that process was so that I can perhaps
give the court a bit of comfort as to the
extent to which we reached out to third-party
payers so that you know that we discharged
appropriately an obligation to make sure that
there was interest, or the lack thereof, of
other third-party payers to participate.

First, of course, we work on the basis of—
having done prior cases—depending upon
how you characterize the third-party payer,
there are between maybe 25,000 and 40,000
individual third-party payers in the country,
for profit, not-for-profit, health insurers,
Taft–Hartley funds, self-insured employers
and the like, but while there are that many of
those third-party payers, the vast majority of
them are administered by third-party admin-
istrators, and the bar, the lawyers that rep-
resent the third-party payers, is a relatively
close bar, at least in terms of using the 80/20
rule, if you will; meaning that there are a
group of lawyers that represent between
about two-thirds to three-quarters of the
third-party payers in the country, represent-
ed them from time and time again in litiga-
tions.

So what we did, of course, first was post
the process on the Web, but then we issued
letters, written letters to all of the lawyers,
attaching a draft of the complaint, having
some discussion about what the situation
was. Obviously, we consider that attorney-
client privileged, but some discussions of
what the process was, and we sent this out to
all of the lawyers that we know that common-
ly represent third-party payers.

In addition, we didn't simply rest on a letter that we sent. I then personally made phone calls, Miss Barnes, on the phone from my office, made phone calls, Mr. Dugan, others, made phone calls to speak with counsel.

The long and the short of the result of that was that in the absence of a class action, which would enable the claims to be aggregated, there were no additional third-party payers who were interested in, for whatever reasons that they have—and I know some of the reasons but I don't feel at liberty, obviously, to disclose them—to make the decision to be added in as either individuals or as class representatives to the complaint.

At that point, of course, the plaintiffs in this case could either proceed on an individual basis for the extent of their claims. As we suggested that I was going to perhaps press you in trying to do class certification on the state side, we still had at least technically those claims available to us.

There was a discussion that was commenced by Mr. Dugan in speaking with counsel for Lilly to determine the conditions under which the parties would be agreeable to dismissing the individual claims of the remaining plaintiffs; that thereby also entailing no longer pursuing any class claims, whether they would be on the federal side, which, of course, essentially the First Circuit and the Second Circuit have said no to, or on the state side, which of course there are myriad overlapping issues with the Second Circuit's prior ruling in any event.

So then we have reached the terms under which there would be a dismissal of the remaining seven third-party payer claims. The process that we have undertaken in connection with that has been the following:

First, we have not—but we will if you indicate—although we have not reached out to parties other than the seven third-party payers, their counsel, and Lilly, because, from my point of view—but you may disagree—we have already done an exhaustive search, both during the course of the litigation, but then this past summer and this past fall, to determine interest in the people to join the case in any event, and having come up literally empty, did not go back to people and tell them anything about what these private third-party payers was doing.

The sum of money—I think it's fair enough to put than on the record, I want to make sure with Mr. Vale.

MR. VALE: I don't know that it's necessary, but we are not insisting on any confidentiality.

MR. SOBOL: I think I still prefer then at least—

THE COURT: I think it's desirable to forfend any possible future claim of lack of diligence. I will discuss that possibility in a moment.

MR. SOBOL: So the sum of money is (sealed as per order of the Court.)

In exchange for that, Lilly, of course, requires a release and a dismissal with prejudice of the claims of the seven third-party payers and, of course, their counsel. There is no further release that goes and would have a binding effect on any party other than the seven third-party payers and their counsel.

The question then came how is it that the lawyers on the plaintiffs' side and their clients would agree to divide that money. As to this process, there are some parts that I feel comfortable sharing with counsel for Lilly, and all of it, of course, I feel comfortable sharing with the court, but let me just go as far as I can and see if there is any issue. First, all seven of the corporate third-party payers have assented to the terms of the resolution.

What I did was, I sat down and I thought, All right, the most important thing is so make sure that the clients assent to this and are treated from their own point of view fairly and appropriately. So what I did is, I took a look at two things: First, regardless of the nature of the expenses or the damages incurred by the third-party payer in the course of this litigation, all of them participated in the litigation as proposed class representatives and therefore, if you will, there should be a senate side of the resolution to them, a sum of money which they would

receive for having been a class representative, or at least having participated in championing that interest.

THE COURT: That goes to the client?

MR. SOBOL: That goes to the client.

In addition to that, I took a look at what they had expended for Zyprexa during the period that was at issue in the case, and we made an estimate as to what their overcharge would have been for Zyprexa during that time period; here, using as a rule of thumb a 40 percent overcharge because the premium on Zyprexa, at least according to the plaintiffs' theory—

THE COURT: What period did you use?

MR. SOBOL: I can't recall off the top of my head, but I believe it was something like 2001 to 2005, which was the time period that you had indicated that the statute of limitations had not barred claims here.

MR. DUGAN: That's correct.

MR. SOBOL: Not going too far back or too far forward. It is a 40 percent premium, that being the difference between Zyprexa and the highest charged other antipsychotic, at least that being the highest premium during that time period.

Having then determined the theoretical, if you will, scope, amount by which each of the seven third-party payers have paid too much, if you will, for Zyprexa, I then weighted that and said, all right, the client's damages are X at 40 percent. In the course of this division of this amount of money, I'm going to weight that as 2, so I'll give them whatever their investment was in the case, if you will, I weighted as 2.

THE COURT: I don't understand "investment."

MR. SOBOL: "Investment" is the wrong word. It's their overcharge times 2.

THE COURT: I understand that.

MR. SOBOL: Okay. Then what I said is, there needs to be some fair way to approach—by the way, I'm saying I rather than we, frankly, because I did it for reasons that will become clearer in a few moments.

Some lawyers had put in a lot of money, some lawyers have put in a lot of time. The ratios of those differ from law firm to law firm. The total amount of expenses in the case is in the millions. The total amount of lodestar is three or four times that amount of money. As you can recall, this was a massive effort that had many, many experts in it.

I then thought that expenses are more important than lodestar because they are out-of-pocket and they don't have inherent in them some form of a return to the law firm. So for each law firm, their expenses were treated at 1.5, not as much as the clients' overcharge had been treated, but not treated either as 1, but at 1.5.

Finally, I looked at the lodestar of the firms and I treated that as 1. So the clients' overcharges were treated as 2.0, the expenses at 1.5 and the lodestar at 1. Then, of course, you've got all these big amounts but, of course, they are all being divided into a much smaller number of (sealed by order of the Court.)

When I divided those sums in, the clients would end up receiving from the (sealed by order of the Court.) So that's about a third of the (sealed by order of the Court) the clients would receive.

Put differently, my estimate was that the clients would be receiving about 30 percent of their single damages each from the resolution.

THE COURT: That's quite a bit higher than I expected.

MR. SOBOL: I think that it was the appropriate way to go. Certainly, given where the case ends up being, the clients getting 30 percent of their single damages is a good result I think for the clients.

Then, as I've indicated, each of the clients have assented to that resolution. Put differently, because I think that the optics of this kind of thing are extremely important, something I'm very, very sensitive to, although under this resolution the lawyers would receive two-thirds and the clients receive a third, which is the opposite way around you normally would expect something like this; however, because the clients are receiving approximately 30 percent of their single

damages, and given the—I'm not exaggerating in this case—the huge amount of expenses and lawyer time that's being uncompensated for, the two-thirds/one-third, under these unique circumstances we thought—I thought, was fair.

THE COURT: What percentage of the attorney's costs and lodestar is being compensated for? You can combine the lodestar and out-of-pocket for this purpose.

MR. SOBOL: About 17 percent.

MS. BARNES: This is Laura Barnes. If the question was the total that the lawyers are getting, their total investment and expenditures is just under 16 percent. The plaintiffs are getting approximately 43 percent of their single damages.

THE COURT: Forty-three percent and 16.

MR. SOBOL: So the lawyers receive that percentage then of their stated lodestar and their expenses.

Again, this was disclosed to the clients as well, and each seven clients have assented.

Now, there was one final issue, which is, did the lawyers amongst themselves agree to the resolution, how to divide the fees and the expenses, all the rest of that, and this is why I put the "I" in it rather than the "we" in it because I wanted to make sure, frankly, that there was no question but that some of the firms who have split their ways during the course of this litigation—this is not seen as sort of a we/them, my firm's been together the whole time and with Mr. Dugan one of the co-lead counsel in connection with the case.

One issue arose in connection with that, of which I'm aware, but, first, so you know, this whole general approach was set forth to all the differing plaintiffs' firms that have been involved in the case throughout.

When we looked at the time and the expenses put into the case, there was no differentiation; in other words, we didn't say, as co-leads we want our time worth more than yours or whatever, we just said, Look, everybody's time is their time, their expenses are treated as their expenses, we're not going to make any of those kind of silly divisions, frankly, under circumstances like this.

The difference of opinion, and I use that word rather than "dispute," it was a difference of opinion, that some lawyers, a couple of the lawyers, among the many law firms, were of the opinion that, Gee, we should be just reimbursing all the expenses and not attributing anything to anybody's time until all the expenses are paid up.

Now, if we did that, then obviously the people who had spent more money by way of out-of-pocket rather than working on the case would do somewhat better. On the other hand, some other lawyers were of the opinion, Gee, you ought not do that because although I wasn't contributing my expenses, I thought the way I was going to be contributing was by all the time and the effort that we were putting in the case and that would be treated in some way appropriately, fairly.

Under the approach that I laid out—I was trying to be as fair and balanced, frankly, to everybody as possible—my own firm does somewhat better along this approach than if it were to be by way of people getting their disbursements back, but I will tell you in complete candor, I didn't know what the result was going to be when I set out this process and tried to set up something that was fair to everybody.

The only reason I lay this out to you is that, of all the law firms that are out there, I don't know of anyone who is going to create any issue if we do it my way or a disbursement way, but what I do want though is that if someone is going to care so much under these circumstances that they want to complain, that they have to come back to you and deal with it here.

I don't want there to be any disputes over what ends up being a relatively modest sum of money and tying up any other jurist in the country. I'm not trying to foist anything on you, but you know the point that I'm simply trying to make here. Let's be done with the case, if we're going to be done with the case and, of course, that is your decision and not ours.

THE COURT: First, you will order a copy of the minutes. We will set a fairly prompt date for any objector to come in and object.

Since they have all, as you say, been fully apprised of your views and the length of almost painfully careful negotiations and work that that has gone into this case, what would you say, two weeks, a month, 30 days; what is your requirement?

MR. SOBOL: I don't think it takes that much time. Frankly, some of the counsel have been of the hope that we could pay these disbursements this calendar year. I think as a practical matter that is not going to happen, but if we did give somebody a couple of weeks, if somebody wanted to object, if we were going to go forward this way, give them a formal opportunity. People do have notice of today's hearing.

THE COURT: I don't think it can be done this calendar year. It's just too short a period to get out an order.

I will issue an order saying that notice of this order shall be given to the parties and their counsel. The court will hold a hearing on January 12th at 10:00 a.m. The parties may appear by written submission, filed at least three days before the hearing, in-person, or by telephone arrangements with Ms. June Lowe, (718) 613–2525.

Attached to the order will be this court's order dismissing the class actions and setting these seven plaintiffs down as individual plaintiffs. We don't have a class action settlement from which an objection could be taken.

The cases are filed as follows—and you'll list them with the numbers of the motion of the plaintiffs.

The transcript of this hearing—if you would like, I will strike the amount.

MR. SOBOL: Strike the amount then.

THE COURT: As redacted. That is enough for the order.

MR. SOBOL: If we're just striking the amount, but not the percentages, then I think that tells everybody what they need.

THE COURT: If there is no objection, I will issue a short memorandum saying the court has fully considered the record, finds the settlements fair to the defendant and to named plaintiffs and to all counsel.

What do you think?

MR. VALE: I think that sounds wonderful. I appreciate Mr. Sobol laying everything out so clearly. I think that is totally appropriate. If nobody files any kind of an objection three days before the 12th—

THE COURT: They don't have to. They can come in and appear.

MR. VALE: We should plan to be here on the 12th, come what may?

THE COURT: I would think so. You can do it by telephone if it's burdensome.

Anything else?

Thank you. Congratulations. It has been a very difficult case.

\*        \*        \*        \*        \*        \*

## Appendix C

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF NEW YORK

In re: Zyprexa Products Liability Litigation:

UFCW Local 1776 and Participating Employers: Health And Welfare Fund, *et al.* on behalf of themselves and others similarly situated Plaintiffs,

v.

Eli Lilly and Company Defendant.

Local 28 Sheetmetal Workers, on behalf of themselves and others similarly situated Plaintiff,:

v.

Eli Lilly and Company, Defendant.

Sergeants Benevolent Association Health And Welfare Fund, on behalf of itself and all others similarly situated, Plaintiff,

v.

Eli Lilly and Company Defendant.

Eric Tayag and Mid–West National Life Insurance Company of Tennessee, Plaintiffs,

v.

Eli Lilly and Company Defendant.

UFCW Local 1776 and Participating Employers Health And Welfare Fund Plaintiff,

v.

Eli Lilly and Company Defendant.

Local 28 Sheetmetal Workers, Plaintiff,

v.

Eli Lilly and Company, Defendant.

Sergeants Benevolent Association Health and: Welfare Fund, Plaintiff,

v.

Eli Lilly and Company, Defendant,

AFSCME District Council 37 Health and: Security Plan, Plaintiff,

v.

Eli Lilly and Company, Defendant.

United Federation of Teachers Health and Welfare Fund, Plaintiff,

v.

Eli Lilly and Company, Defendant.

MDL 1596, 04–md–1596, 05–cv–4115, 05–cv–2948, 06–cv–0021, 06–cv–6322, 11–cv–5675, 11–cv–5676, 11–cv–5677, 11–cv–5678, 11–cv–5679, 11–cv–5680

## PLAINTIFFS' REPORT TO THE COURT ACCOMPANYING REQUEST FOR ORDER OF DISMISSAL

Plaintiffs respectfully move this Court for entry of an order of dismissal of their claims in the above-referenced Zyprexa purchase claim cases, following the next status conference.

### I. Background

A short procedural history helps put Plaintiffs' request for dismissal in context.

In mid–2005, the first of several health benefit providers ("HBPs") filed suit against Eli Lilly and Company, on behalf of a putative class, alleging Lilly engaged in fraudulent conduct in connection with the marketing and sale of Zyprexa, an atypical antipsychotic drug available by prescription. Together, these HBPs argued Lilly's conduct caused them to pay both too much for and for too many prescriptions of Zyprexa. Involved and substantial discovery, briefing, hearings and rulings over the next five years were conducted in this Court.

### II. The Second Circuit's Decision

In September 2010, the Second Circuit Court of Appeals reversed this Court's denial of summary judgment and granting of class certification of Plaintiffs' RICO claims. *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir.2010).

The Second Circuit's opinion effectively ended the federal claims in this case. Adopting a confusing 'shared motivation' test, the contours of which have not been explained, the Second Circuit determined class certification could not stand because doctors do not consider the price of a medication when making prescribing decisions but HBPs do when making coverage decisions. Accordingly, says the Second Circuit, "any reliance by doctors on misrepresentations as to the efficacy and side effects of a drug, therefore, was not a but for cause of the price that [HBPs] ultimately paid for each prescription." *UFCW Local 1776*, 620 F.3d at 133–34. The Second Circuit provides no reason why both doctors and HBPs must share the same motivation or consider the same factors for either to have been affected by Lilly's conduct. The omission of citation to law or policy supporting this holding is curious, particularly given Second Circuit's ruling in *Desiano v. Warner–Lambert Co.* where it held that this circuit "and other courts have long recognized the right of HBPs to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices." 326 F.3d 339, 350 (2d Cir.2003). Nonetheless, because the Supreme Court denied Plaintiffs' petition for *certiorari*, further appellate review of this holding (and elucidation of the 'shared motivation' test) will not occur here.

The Second Circuit only disposed of Plaintiffs' RICO claims, having no opportunity to

address, because they were not before the Court, the state law claims raised in Plaintiffs' complaints. While these state law claims remain, and good law exists supporting the certification of classes of purchasers under such laws, we expect the Second Circuit will exhibit the same lack of approbation for the state law claims as it did to RICO. In essence, it is hard to see how reasonable litigants can pursue these claims given the Second Circuit's ruling that private payors cannot recover for fraud, waste and abuse unless they show that payors and doctors share the same motivations.

Finally, the litigation costs associated with individual (i.e. non-class) litigation make impractical further pursuit of the case. Since the litigation began more than six years ago, counsel for the putative class has incurred millions in hard expenses and many more millions in lodestar. No single payor can afford to assert claims with these kinds of expenses.

### III. Significant Outreach to Health Benefit Providers

Following the denial by the Second Circuit of Plaintiffs' petition for rehearing *en banc,* the Supreme Court denied a petition for *certiorari* earlier this year. *Sergeants Benev. Ass'n Health & Welfare Fund v. Eli Lilly & Co.,* — U.S. ——, 131 S.Ct. 3062, 180 L.Ed.2d 903 (2011). This Court then ordered the parties to move forward to summary judgment on remaining state law claims after determining which, if any, HBPs wished to remain in or join the case on a non-class basis. Pursuant to this Court's case management order, Plaintiffs amended the operative master complaint for these cases, consistent with the Second Circuit's rulings, and made the draft available to Eli Lilly and the HBP community by August 23, 2011, so that any interested HBP could opt-in to the litigation.

Hagens Berman Sobol Shapiro LLP and the Dugan Law Firm, which served as Co-Lead Class Counsel in this litigation, have litigated HBP class cases for approximately a decade and accordingly know the majority of law firms who represent HBPs across the country. The group is a small one: sixteen law firms commonly represent or have communications with HBPs that cover approximately 75–80% of privately insured lives in the United States. Hagens Berman wrote and sent letters to each of these sixteen firms, enclosing the Court's order and the draft amended complaint and specifically identifying the waiver of rights to pursue Zyprexa litigation that would occur on September 22, 2011. *See* Declaration of Thomas M. Sobol filed in support of Plaintiffs' report, attached as Exhibit A. Hagens Berman and Dugan Law Firm also published the Court's order and the draft amended complaint on www.zyprexalitigationdocuments.com. (The documents remain available online as of this writing, approximately three and a half months later.)

No later than the close of business on September 22, 2011, any HBP wishing to intervene in the Zyprexa purchase claim cases was to either (i) file a complaint in intervention, or (ii) provide Hagens Berman and/or Dugan Law Firm with a certification of their intent to opt-in to the litigation.

After fielding multiple calls and holding numerous meetings with the individually contacted law firms and some of their HBP clients, and without the hope of class certification given the Second Circuit's rulings, no additional HBP agreed to file suit. Only the six HBPs who served as putative class representatives remain.

### IV. Plaintiffs' Request for Dismissal

The parties have agreed to a dismissal of all remaining individual claims, along with a waiver of all appellate rights in this litigation, with a minimal payment by Lilly. Each of the six clients has been presented with a recommendation for dismissal, along with a proposed allocation of the minimal payment between clients and counsel. All six clients have agreed both to the dismissal and to the allocation plan provided by counsel.

At the status conference currently scheduled for December 19, 2011, we will set forth the terms of the dismissal, the allocation between the parties, and any other details the Court wishes to hear.

Accordingly, Plaintiffs request this Court enter an order of dismissal in the above-referenced cases following that status conference.

Dated: December 9, 2011

Respectfully submitted,

/s/ Lauren Guth Barnes

Thomas M. Sobol

David S. Nalven

Lauren Guth Barnes

Kristen Johnson Parker

HAGENS BERMAN SOBOL SHAPIRO LLP

55 Cambridge Parkway, Suite 301

Cambridge, MA 02142

Telephone: (617) 482–3700

James R. Dugan, II

Doug Plymale, Ph. D.

DUGAN LAW FIRM

365 Canal St., Suite 1000

New Orleans, Louisiana 70130

Telephone: (504) 648–0180

COUNSEL FOR PURCHASE CLAIM CASES

### CERTIFICATE OF SERVICE

I, Lauren Guth Barnes, hereby certify that the above Plaintiffs' Report to the Court Accompanying Request for Order of Dismissal was served on all parties via the CM/ECF system on December 9, 2011.

/s/ Lauren Guth Barnes
Lauren Guth Barnes